61 S.W.3d 691 (2001)
In the Interest of A.R.R.
No. 2-01-030-CV.
Court of Appeals of Texas, Fort Worth.
November 8, 2001.
*693 Morris & Morris, L.L.P., S. Rafe Foreman and Jacqueline D. Novas, Flower Mound, for Appellant.
Bruce Isaacks, Criminal District Attorney, Pamela Moore Lakatos and William Kuykendall, Assistant District Attorneys, Denton, for Appellee.
PANEL B: LIVINGSTON, HOLMAN, and WALKER, JJ.

OPINION
DIXON W. HOLMAN, Justice.
Appellant Earl Alan Rosenfeld appeals the termination of his parental rights to his child, A.R.R. Rosenfeld complains that (1) the trial court improperly applied section 161.001(1)(L) and (Q) to terminate his parental rights in violation of article I, section 16 of the constitution's prohibition against ex post facto laws; (2) there was no evidence to support the trial court's *694 finding that his parental rights should be terminated; (3) there was no evidence to support the trial court's finding that the termination was in the best interest of the child; and (4) Appellant received ineffective assistance of counsel when his trial counsel failed to raise the defense of limitations or laches. We affirm the trial court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND
A.R.R. was born in 1985. In 1991, Appellant was indicted for sexually assaulting A.R.R.'s older sister, but fled to an unknown location for several years. Appellant eventually pled nolo contendere to the charge in 1995 and was placed on five years' probation. After violating seven of the terms of his probation, it was revoked and Appellant was incarcerated in 1996. Currently, though Appellant is eligible for parole, he has requested to remain in prison for the full term, which will end in 2005, when A.R.R. is twenty years old.
In 1993, after living with relatives, A.R.R. again began to reside with her mother. Her mother had several boyfriends and moved around to be with them. Eventually, in 1996, A.R.R. and her mother moved into the home of Jack Hollinsworth. Shortly thereafter, A.R.R. informed her mother that Hollinsworth had touched her breast and forced her to touch his genitals. Because A.R.R.'s mother did not want to leave Hollinsworth, she placed A.R.R. in a children's home for two years. A.R.R.'s behavior at the home became worse and the home finally forced A.R.R. to leave. She was put back in her mother's custody after her mother left Hollinsworth.
In 1999, A.R.R. appeared in court for a hearing on probation for physically assaulting her mother and sister. At that time, her probation officer, Shirene Nelson, noted that A.R.R. looked ill. Nelson learned that A.R.R. had been living in the back of an eighteen-wheeler while she traveled with her mother and Shane Whorley, her mother's new boyfriend.
According to Nelson, A.R.R. had not eaten or showered for some time, was suffering from a severe cold, was not attending school, and had gotten into at least one altercation with Whorley during which he bent her fingers backward. A.R.R.'s mother informed Nelson that she and A.R.R. would be leaving the state to travel in Whorley's eighteen-wheeler with him. Because of A.R.R.'s poor condition and the fact that out-of-state travel was in violation of A.R.R.'s probation, Nelson contacted Child Protective Services (CPS), which obtained an emergency removal of A.R.R. from her mother's custody. A.R.R. was temporarily put into foster care because her mother left the state to travel with Whorley.
On October 4, 1999, the Texas Department of Protective and Regulatory Services (TDPRS) brought suit to determine the parental rights of both Appellant and A.R.R.'s mother. At an adversary hearing on October 15, 1999, TDPRS was appointed temporary sole managing conservator of A.R.R. After a status hearing and three permanency hearings, a final termination hearing was held on December 18, 2000. A.R.R., who was fifteen at the time of the final hearing, testified that she wanted the parent-child relationship between her and Appellant terminated. The trial court's findings of fact noted, "[A.R.R.] is 12 years of age or older and has expressed a strong desire against termination of her mother's parental rights or being adopted. [A.R.R.] desires to have her father's parental rights terminated."
On December 22, 2000, the court issued its final order, appointing TDPRS as permanent managing conservator. The court ordered that A.R.R.'s mother be appointed *695 possessory conservator with supervised visitation, and that Appellant's parental rights be permanently terminated. The court found by clear and convincing evidence that Appellant's rights should be terminated pursuant to section 161.001(1)(B), (L)(vi), and (Q), which provide:
The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence:
(1) that the parent has:
....
(B) voluntarily left the child alone or in the possession of another not the parent without expressing an intent to return, without providing for the adequate support of the child, and remained away for a period of at least three months;
....
(L) been convicted or has been placed on community supervision ... for being criminally responsible for the death or serious injury of a child under the following sections of the Penal Code....
....
(vi) Section 22.011 (sexual assault);
....
(Q) knowingly engaged in criminal conduct that has resulted in the parent's:
(i) conviction of an offense; and
(ii) confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition.
Tex. Fam.Code Ann. § 161.001 (Vernon Supp.2001).

INEFFECTIVE ASSISTANCE OF COUNSEL
In his fourth issue, Appellant argues that the residuary statute of limitations should apply to termination proceedings because there is no other authority in the family code or elsewhere that dictates the length of time a party has to bring such a cause of action. See Tex. Civ. Prac. & Rem.Code Ann. § 16.051 (Vernon 1997) (providing "[e]very action for which there is no express limitations period ... must be brought not later than four years after the day the cause of action accrues"). Appellant believes that TDPRS was barred from bringing its termination proceeding in 1999 because it was based on his conviction and confinement for acts he committed against his other child in 1990, and that his counsel was ineffective because he failed to raise such a defense.
Nevertheless, the Sixth Amendment right to effective assistance of counsel has not yet been extended to civil actions despite being a right clearly recognized in criminal proceedings. In re B.B., 971 S.W.2d 160, 172 (Tex.App.-Beaumont 1998, pet. denied); Arteaga v. Tex. Dep't of Protective and Regulatory Servs., 924 S.W.2d 756, 762 (Tex.App.-Austin 1996, writ denied); In re J.F., 888 S.W.2d 140, 143 (Tex.App.-Tyler 1994, no writ); Posner v. Dallas County Child Welfare Unit, 784 S.W.2d 585, 588 (Tex.App.-Eastland 1990, writ denied); Howell v. Dallas County Child Welfare Unit, 710 S.W.2d 729, 734-35 (Tex.App.-Dallas 1986, writ ref'd n.r.e.), cert. denied, 481 U.S. 1018, 107 S.Ct. 1898, 95 L.Ed.2d 505 (1987).[1] We overrule the fourth issue.

EX POST FACTO COMPLAINTS
In his first issue, Appellant complains that the trial court's reliance on *696 section 161.001(1)(L) and (Q) to terminate his parental rights violates his right against the imposition of ex post facto laws. Appellant bases his contention on the fact that he committed the sexual assault on his daughter in 1990 and subsections L and Q were not enacted until 1997.
Both the Texas and federal constitutions protect citizens from the application of ex post facto laws. U.S. Const. art. I, § 10; Tex. Const. art. I, § 16. However, though the United States Constitution's ex post facto provision applies only to criminal proceedings, the Texas Constitution's ex post facto provision applies to both criminal and civil cases. In re Shaw, 966 S.W.2d 174, 179 (Tex.App.-El Paso 1998, no pet.).
Appellant relies on Shaw to support his ex post facto argument, but it is distinguishable from this case. In Shaw, one of the grounds for termination was that contained in former section 161.001(1)(N). Id. at 179. Subsection N contained a provision stating that TDPRS must have been the temporary or permanent managing conservator of a child for "not less than one year"[2] before a parent could be found to have constructively abandoned the child. Id. at 180. The court in Shaw found the statute violated the ex post facto provision because, in calculating the one-year period required by subsection N, the court had to include time prior to the 1995 date on which the statute became effective. Id. at 182.
Here, the characteristics of an ex post facto violation are not present. Subsection L does not sanction Appellant now for an act that was legal when he committed it, or deprive Appellant of a defense that, at the time he committed the assault, was available.[3] Since 1986, the family code has provided that one basis for termination of a parent's rights is if the parent has been adjudicated criminally responsible for the death of or serious injury to a child. Tex. Fam.Code Ann. § 15.02(L) (Vernon 1986) (current version at Tex. Fam.Code Ann. § 161.001(1)(L)). Any sort of crime against a child, including sexual assault, constituted "serious injury" to a child under former section 15.02(L). Therefore, the court's use of current subsection L to terminate Appellant's parental rights was not in violation of the ex post facto provisions of the Texas Constitution.
The elements of section 161.001(1)(Q) are: (1) conviction of an offense; (2) imprisonment for that offense; and (3) inability to care for the child due to imprisonment for at least two years prior to the date on which the petition to terminate the parent's rights was filed. Tex. Fam.Code Ann. § 161.001(1)(Q)(i), (ii). The latest version of subsection Q went into effect on September 1, 1997 and the petition to terminate Appellant's parental rights was filed on October 4, 1999. Because the trial court did not include time prior to the statute's effective date in calculating two years from the date the petition was filed, it did not apply subsection Q retroactively. Appellant's ex post facto complaint as to both subsections L and Q is overruled.

THE STANDARD OF REVIEW IN TERMINATION CASES
A parent's rights to "the companionship, care, custody and management" of *697 his children are constitutional interests "far more precious than any property right." Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982). In a termination case, the State seeks not just to limit those rights but to end them permanently-to divest the parent and child of all legal rights, privileges, duties and powers normally existing between them, except for the child's right to inherit. Tex. Fam.Code Ann. § 161.206(b) (Vernon 1996); Holick v. Smith, 685 S.W.2d 18, 20 (Tex.1985).
In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (Vernon Supp.2001); Richardson v. Green, 677 S.W.2d 497, 499 (Tex.1984). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.1987).
Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by "clear and convincing evidence." Tex. Fam. Code Ann. § 161.206(a) (Vernon 1996). This standard is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Id. § 101.007; Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 31 (Tex. 1994). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. State v. Addington, 588 S.W.2d 569, 570 (Tex.1979).
Review of factual sufficiency of the evidence under a clear and convincing standard requires us to determine whether the evidence is sufficient to make the existence of the facts highly probable, not whether the evidence supporting the finding is sufficient to make the existence of fact more probable than not, as in ordinary civil cases. In re D.T., 34 S.W.3d 625, 632 (Tex.App.-Fort Worth 2000, pet. denied) (op. on reh'g). That is, we must consider whether the evidence is sufficient to produce in the mind of the fact finder a firm belief or conviction as to the truth of the allegation sought to be established. Id.; Faram v. Gervitz Faram, 895 S.W.2d 839, 843 (Tex.App.-Fort Worth 1995, no writ). We are required to consider all of the evidence in the case in making this determination. Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 406 (Tex.), cert. denied, 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998). Accordingly, Appellant must show that the evidence is so weak or the evidence to the contrary is so overwhelming that the trier of fact could not have reasonably concluded that there was a high probability that the conduct or endangerment of the child occurred or that termination was in the best interest of the child.
In evaluating the legal sufficiency of the evidence supporting a trial court's decision to terminate parental rights we are to consider only the evidence and inferences supporting the trial court's findings and disregard all contrary evidence and inferences. In re B.B., 971 S.W.2d at 164; Lucas v. Tex. Dep't of Protective and Regulatory Servs., 949 S.W.2d 500, 502 (Tex.App.-Waco 1997, writ denied). If more than a scintilla of evidence supports the trial court's findings, the appealing parent cannot prevail on a legal sufficiency point. In re R.D., 955 S.W.2d 364, 368 (Tex.App.-San Antonio *698 1997, pet. denied). So long as we find that at least one of the three grounds for termination was supported by the evidence and that termination is in the best interest of A.R.R., we may uphold the trial court's judgment even if there was not sufficient evidence to support termination on the other two grounds. See In re K.C., Jr., 23 S.W.3d 604, 607 (Tex.App.-Beaumont 2000, no pet.).

In Re D.T.
Because Appellant relies on our holding in D.T. as support for his assertion that we are precluded from affirming the termination of Appellant's rights in this case, we will address it. We need not in any way disturb our holding in D.T. to affirm the termination of Appellant's rights here, because the cases are distinguishable.
Appellant has misconstrued the rule we discussed in D.T. He asserts that our holding in D.T. was that imprisonment alone is never grounds for termination. However, what we actually said was, "It has long been settled that imprisonment, standing alone, does not constitute `abandonment' of a child [or endangerment] for purposes of termination of parental rights." In re D.T., 34 S.W.3d at 633 (emphasis added) (citing Boyd, 727 S.W.2d at 533 (holding imprisonment alone does not constitute "endangering a child"); In re S.D.H., 591 S.W.2d 637, 638 (Tex.Civ.App.-Eastland 1979, no writ) (holding imprisonment does not constitute "abandonment" or "endangering" a child); H.W.J. v. State Dep't of Public Welfare, 543 S.W.2d 9, 11 (Tex.Civ. App.-Texarkana 1976, no writ) (same); Hutson v. Haggard, 475 S.W.2d 330, 333 (Tex.Civ.App.-Beaumont 1971, no writ) (holding imprisonment is not "abandonment")).
In D.T., our discussion of the imprisonment rule arose in the context of termination under section 161.001(1)(E), which involves child endangerment. Here, however, we are concerned with termination under section 161.001(1)(L) and (Q). Unlike subsection E, subsections L and Q are separate grounds for termination that specify imprisonment as an element. Furthermore, the trial court in this case did not find that imprisonment alone was grounds for Appellant's termination. It found that imprisonment in combination with a sexual assault that seriously injured a child under subsection L, and imprisonment in combination with a conviction and the lack of care for two years under subsection Q, was grounds for termination. We attempted to make this point in D.T. by distinguishing subsection E from subsections L and Q. Id. at 638. As to subsection L, we noted that because writing bad checks was not one of the crimes enumerated, our decision was "consistent with the Texas statutory scheme regarding the effect of criminal conduct and imprisonment." Id. at 638. We also noted, as to subsection Q, that "[a]s amended in 1997, the family code now includes imprisonment for two years or more as a separate ground for termination.... [but] TDPRS did not plead [subsection Q] as a basis for termination in this case." Id.
Moreover, Appellant is not like the mother in D.T. The mother in D.T. took adequate care of her child prior to her imprisonment, and, during the one-year term of her imprisonment, went to extensive lengths to call TDPRS, write letters to inquire about her child's well-being, ask for pictures and updates on her child, and advise TDPRS that she did not want her child adopted or her parental rights terminated. Id. at 633. "D.T. was well-cared for by Appellant prior to her arrest ... was bonding with Appellant ... was with her most of the time except when she was *699 at work, and ... was generally a healthy, happy baby." Id. at 639.
We noted in D.T. certain factors to be considered, other than imprisonment itself, that aid in the determination of whether an imprisoned parent's rights should be terminated. In that regard we stated:
Absent specific guidance from the supreme court on the troublesome issue of termination of an imprisoned parent's rights, we believe that, in considering all of the evidence, we should look not only at incarceration as a "factor" but also at the expected length of the sentence and whether the underlying conduct is of a type, in and of itself, from which endangerment of the child may be inferred.
Id. at 638. In D.T., the fact that the length of the mother's imprisonment was only twelve months, and the underlying conduct was writing bad checks, weighed in favor of our finding that the mother did not "endanger" her child under subsection E. In the present case, though subsection E is not at issue, the precise factors that assisted the mother in D.T. militate against Appellant: (1) When Appellant leaves prison, he will have been incarcerated for a total of nine years, in part due to his voluntary request to remain in prison until 2005; and (2) the reason for Appellant's imprisonment is that he violated the parole on which he was placed for sexually assaulting A.R.R.'s older sister by penetrating her vagina with his finger. Other than the fact that her behavior resulted in imprisonment, we fail to see how the mother's conduct in D.T. is in any way analogous to Appellant's conduct in this case.

SUFFICIENCY OF THE EVIDENCE
Appellant asserts that there is neither evidence to support parental termination under section 161.001, nor to support the trial court's finding that the termination was in the best interest of A.R.R.

Subsection L
In applying the elements of section 161.001(1)(L), termination is permissible only if: (1) the parent has committed acts constituting a violation of one of the statutorily enumerated crimes listed in subsection L; (2) the parent's guilt for committing the crime has been adjudicated or the adjudication of that guilt has been deferred; and (3) the parent, in committing the acts that underlie the crime, was responsible for a child's death or serious injury. Vidaurri v. Ensey, 58 S.W.3d 142, 145 (Tex.App.-Amarillo 2001, no pet.).
In Vidaurri, the court of appeals found that there was insufficient evidence of the above three factors on grounds that there was no evidence to show that the child suffered serious injury. Id. The court found that it was not required to infer that the father in the case caused the death or serious injury to the child simply because he was convicted of the crime. Id. The court reasoned that there was no evidence that the father confessed to committing the crime, there was no evidence that, even though the child saw the crime, she was physically or mentally harmed by the sight, and there was no evidence that the children were removed from the father's home because of the commission of the crime. Id. at 146-148.
Here, however, the facts and evidence in the record prove each of the three required elements. First, at the final termination hearing, Appellant himself testified that he sexually assaulted one of his twin daughters in 1990, when she was eight years old. He admitted that he was in control of his senses when he committed the assault and that he was fully competent when he pled nolo contendere to the offense. Appellant characterized the sexual assault as "a mistake" that he has since had to "live with"the mistake being that *700 he "inappropriately touched [his] daughter." Charlotte Guest, a CPS caseworker with a master's degree in family counseling, testified that she had worked solely with abused and neglected children, including children who were sexually abused, in her nine years with CPS. She testified that the type of sexual abuse that Appellant committed against his daughter causes a child to sustain serious injury to her emotional well-being, and that such an injury could present a "lifelong problem." In light of Appellant's testimony and the other evidence, there is no dispute as to the first element, that Appellant sexually assaulted A.R.R.'s sister. In addition, there is uncontroverted evidence in the record that Appellant's act seriously injured the child upon which the act was committed, which supports the third element of subsection L.
As to whether Appellant's guilt was adjudicated, there is other evidence in TDPRS's favor. The record contains the 1991 indictment that was returned against Appellant, which stated that Appellant "knowingly and intentionally cause[d] the penetration of the female sexual organ of [his daughter], a child, by an object ... [his] finger ... and at the time of the offense, the child was younger than 14 years of age." Appellant pled nolo contendere to this offense.
The record also contains a 1995 document entitled "Conditions of Probation," which was signed by Appellant, and a 1996 "Motion to Revoke Probation," which dictated that Appellant would serve ten years in prison, beginning May 6, 1996, for violating seven terms of his probation. Consequently, there was clearly both legally and factually sufficient evidence from which the trial court determined that Appellant's guilt was adjudicated under the second element. Because all three elements of section 161.001(L) were supported by clear and convincing evidence, the trial court properly determined that Appellant's parental rights should be terminated under that subsection.

Subsection Q
Here, it is uncontested that Appellant was convicted of and imprisoned for engaging in criminal conduct. Therefore, we need only consider whether the imprisonment resulted in his inability to care for A.R.R. for at least two years before the 1999 filing of the petition. There is nothing in the record that Appellant cared for A.R.R. at any time after 1991, much less that he cared for or arranged to have her cared for during the three years he was incarcerated before the 1999 proceeding. Therefore, the record reflects that from the time A.R.R. was five years old until the present.
The last time Appellant spoke to A.R.R. was when she and her mother visited him in prison in 1996. Before that time, the record is silent as to any contact between the two after Appellant voluntarily left his family in 1991. During the 1996 visit, Appellant testified that A.R.R. informed him that she had been touched inappropriately by her mother's boyfriend, and that her mother had allowed it to happen to her. Though Appellant testified that he told A.R.R. to "cry out" and report the abuse, there is nothing in the record to indicate that Appellant attempted to contact the authorities or seek any sort of assistance on behalf of his daughter, who was only eleven years old at the time. Such conduct militates against a finding that Appellant cared for his daughter's physical or emotional well-being, much less her financial stability.
Moreover, Appellant could not only have prevented his imprisonment by refraining from sexually assaulting A.R.R.'s sister, he could have prevented it simply by following *701 the terms of his probation. Appellant testified that he was aware of the terms of his probation, and that he knew that if he violated them, he would be sent to prison. However, Appellant testified that despite his knowledge of the consequences, he "never showed up for probation" because he "felt it was unjust." Appellant maintained that when he became eligible for parole, he wrote the parole board and requested that he be allowed to remain in prison until his release date in 2005, even though there is "no chance" that he will see A.R.R. until she is twenty years old if he stays in prison that long. It is clear that Appellant's voluntary actions imprisoned him and cause him to remain imprisoned still, and that the same actions rendered him unable to provide any sort of financial, emotional, or physical care for his daughter. Accordingly, we find the evidence both legally and factually sufficient for the trial court to terminate Appellant's rights under section 161.001(1)(Q). We decline to address whether termination is proper under subsection B, as we need only find there is sufficient evidence on one ground of termination to uphold the court's judgment.

A.R.R.'s Best Interest
Having found that the evidence supported the termination of Appellant's rights, we turn to the second prong of whether such termination is in A.R.R.'s best interest. A nonexclusive list of factors that serve as guidelines for triers of fact to determine the best interest of the child in termination cases includes:
(1) the desires of the child and the emotional and physical needs of the child now and in the future;
(2) the emotional and physical danger to the child now and in the future;
(3) the parental abilities of the individual seeking custody and the programs available to assist this individual to promote the best interest of the child;
(4) the plans for the child by the individual seeking custody, and the stability of the proposed home; and
(5) the acts or omissions of the parents that may indicate that the existing parent-child relationship is not a proper one.
Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex.1976).
A.R.R.'s Needs and Desires
A.R.R. unequivocally testified that she wanted the court to terminate her father's parental rights and there is no evidence in the record that such a termination would be contrary to her best interest. We find this testimony particularly compelling considering that A.R.R. was fifteen at the time of the termination proceeding. As a likely result of her parent's acts and omissions, A.R.R. has suffered from severe emotional and behavioral problems, has been sexually and physically abused, has had to fight back from an alcohol and drug addiction, and has been on probation for assault, all by the age of fifteen. A.R.R. is mature enough to help choose whether her father's rights are terminated.
After Appellant fled from his family in 1991, A.R.R. spent at least ten of the next fifteen years with grandparents or foster parents, in shelters or other such placements, or with a mother who was not capable of properly caring for her. Jeanine Leagh, A.R.R.'s guardian ad litem, testified that A.R.R. needs a controlled, stable, and structured environment now and in the future, and that she is currently in such an environment with her foster mother. A.R.R's caseworker, Guest, testified that A.R.R. spent approximately ten of her fifteen years away from her mother and five with her mother, which resulted in an unstable childhood. Guest stated, however, *702 that A.R.R. is doing extremely well in her current placement with her foster mother, with whom A.R.R. is "very close." She also stated that it is in her best interest to stay with her foster mother until she graduates from high school, as A.R.R. has expressed the desire to do. Guest added that although A.R.R. is and must remain on medication and in therapy for her behavioral and emotional problems, she has "worked extremely hard," completed her probation, and is happily involved in church and school activities.
Contrary to Appellant's assertion, In re C.H. is distinguishable from this case. In that case, the court held that evidence that the child needed permanence and stability and had bonded with her foster family was not enough to warrant termination of parental rights where there was no evidence that the foster parents intended to adopt the child. 25 S.W.3d 38, 54 (Tex.App.-El Paso 2000, pet. granted). This lack of evidence, the court noted, indicated that at some point, the "emotional ties" between the child and his foster family would have to be severed, which was contrary to the State's assertion that C.H. benefitted by remaining with his foster parents. Id.
Here, A.R.R. asserted that she does not wish to be adopted because she is already fifteen years old and wants to live with her foster family only until she graduates from high school. A.R.R. is not an infant who will grow up with her foster family, as in C.H.'s case, only to be later taken away, causing her further emotional detriment. A.R.R. is nearly of majority age and understands that once she is eighteen, she can live on her own without a foster family.
There was no testimony or evidence in the record to contradict that A.R.R. is best-suited in her current environment and that she could be harmed by altering that environment in any way. Though A.R.R. is apparently doing well at the present time, there was ample testimony to the effect that A.R.R.'s fragile condition could easily deteriorate if her environment is disturbed by her father's return to her life after ten years.
Emotional and Physical Danger to A.R.R.
When asked why he would not pose a danger to A.R.R., Appellant testified that he will not be released from prison until 2005, and by then A.R.R. will be over eighteen. Though this may be true, there is nothing in the record, other than Appellant's assertion, to guarantee that he will stay in prison until 2005, rather than accepting parole before A.R.R. turns eighteen. If Appellant decided to do so, he would presumably have the right to gain custody of A.R.R. and have her reside with him if his parental rights remained intact. Dr. Lydia Simmons, A.R.R.'s psychotherapist, testified that it would be very traumatic to put a child like A.R.R., who had been sexually abused, with a person that she knew had sexually abused another child.
Although it is true that he cannot physically endanger A.R.R. while in prison, Appellant stated that he wanted to communicate with his daughter through letters if his rights were not terminated. Appellant has undergone no counseling regarding the sexual abuse of A.R.R.'s sister, and testified that he could not undergo such therapy until 2003. However, by that time, Appellant will have had two years during which to communicate with A.R.R. before having received any counseling for his sex offense.
Dr. Simmons testified that even letters to the effect of, "I love you, I hope things are going well," could adversely affect an unstable child like A.R.R., especially considering that her father was incarcerated for sexually abusing her sister. The doctor added that some sex offenders were *703 very good at "grooming" children, through the use of certain phrases or words, which cause the children to learn to recognize certain phrases or words as having a sexual meaning, even though other readers would not recognize the terms as sexual. This statement refuted Appellant's suggestion that A.R.R. could be protected from potential danger if Appellant's letters were screened before A.R.R. was allowed to read them. In light of the evidence in the record, it is highly probable that contact between Appellant and his daughter, even in the form of letters, could place A.R.R. in further emotional or physical danger.
Appellant's Rehabilitation
Appellant has yet to undergo any parenting class or other such program through which he might have improved his parenting skills. Though he has completed his GED and has taken some college courses, Appellant has apparently not chosen to educate himself in a way that would more directly benefit A.R.R.
Appellant's parental abilities, according to the record, are virtually non-existent. The only contact that Appellant has had with A.R.R. since she was six years old was in 1996, when A.R.R. chose to visit him in prison. Appellant voluntarily left A.R.R. and the rest of his family in 1991, according to his testimony, because he caught his wife in bed with another man. In the five years between the time he left his family and the time he was imprisoned, the record fails to indicate any time that Appellant attempted to contact A.R.R. or tried to support her financially or otherwise. Appellant testified that he attempted to contact A.R.R. by mailing letters to her "mother, grandparents, and the court," though he failed to state when he mailed the letters. From the record, there is clear and convincing evidence that Appellant's parenting skills are inadequate and that he has neither undergone nor will undergo treatment that might remedy the situation before A.R.R. turns eighteen.
Plans for A.R.R. and Stability of the Home
Appellant testified that he would be in prison until after A.R.R. turns eighteen and, therefore, that she would never live with him. His only wish, he said, was to be able to write her letters and communicate with her. There is nothing in the record to indicate that Appellant is precluded from contacting A.R.R. even if we uphold the termination of his rights. Moreover, A.R.R. is certainly free to contact Appellant should she choose to do so. The fact that A.R.R. can never reside with Appellant, unless she voluntarily does so after she is eighteen, does not automatically mean that A.R.R. should be subjected to visitation or other contact with her father, or that such contact would be in her best interest. According to the record, A.R.R. is finally in a stable and nurturing environment with her foster mother. Therefore, we conclude that there is clear and convincing evidence that the termination of Appellant's parental rights is in A.R.R.'s best interest. We overrule Appellant's second and third points.

CONCLUSION
We conclude that there was no ex post facto application of section 161.001(1)(L) and (Q) that could have violated Appellant's constitutional rights and that termination of the parent-child relationship between Appellant and A.R.R. was supported by clear and convincing evidence, as was the trial court's finding that termination was in the best interest of A.R.R. We affirm the trial court's judgment.
NOTES
[1] Although the Houston and Waco appellate courts have recently held that the right to effective assistance of counsel extends to parties in termination cases, the supreme court has yet to address the issue. See In re A.V., 57 S.W.3d 51, 57 (Tex.App.-Waco 2001, no pet. h.); In re J.M.S., 43 S.W.3d 60, 62 (Tex. App.-Houston [1st Dist.] 2001, no pet.).
[2] The current statute reads "not less than six months." Tex. Fam.Code Ann. § 161.001(1)(N) (emphasis added).
[3] The 1997 version of subsection L provides that the court may order termination of the parent-child relationship if the parent has "been convicted or has been placed on community supervision ... for being criminally responsible for the death or serious injury of a child under the following sections of the Penal Code." Tex. Fam.Code Ann. § 161.001(1)(L).