**In the Interest of A.L.S.**

**No. 08–99–00283–CV.**

Court of Appeals of Texas,
El Paso.

April 18, 2002.

Stephen Hargrove, Odessa, John L. Pool, District and County Atty., Andrews, for Appellant.

Kevin R. Bartley, Kevin R. Bartley, PC, Odessa, for Appellee.

Before Panel No. 2 BARAJAS, C.J., McCLURE, and CHEW, JJ.

## OPINION

RICHARD BARAJAS, Chief Justice.

Steven Becker appeals the termination of the parent-child relationship with his daughter. For the reasons set forth below, we affirm.

## I. SUMMARY OF THE EVIDENCE

At the time of trial, Becker was 27 years old and had been dishonorably discharged from the United States Army. In July 1993, he pled guilty to burglary of a habitation and forgery for which he was sentenced to ten years' probation. Later that summer, Becker became involved in a relationship with Misty Sinks as a result of which she became pregnant. A.L.S. was born July 24, 1994. Within weeks of her birth, Becker's probation was amended as a result of his failure to report to his probation officer.[1] A new condition was added which required Becker to serve an alternative community supervision sentence of twelve months in the Taylor–Callahan–Coleman Counties' Restitution Center. On December 28, 1994, the State

---

1. Pursuant to the terms and conditions of his probation, Becker was to remain within Taylor, Callahan, Jones, and Shackleford Counties. However, he moved from Abilene to Odessa. Odessa is in Ector County.

filed a motion to revoke Becker's probation because he had absconded from the Restitution Center. The motion to revoke was amended on January 12, 1995 to allege nineteen probation violations. On February 17, 1995, Becker's probation was revoked and he was sentenced to ten years' incarceration. In early 1996, he was paroled.

During this period of time, the office of the Attorney General brought suit to establish the paternity of A.L.S. Becker initially contended that he was not the father. He had not paid for any medical expenses associated with the child's birth. By order entered March 1, 1996, Becker was adjudicated as the father and was ordered to pay child support of $130 a month, to provide medical insurance, and to pay 50 percent of all medical expenses not covered by insurance. Becker made one child support payment of $69.23 in April 1996.

By this time, Becker had admittedly violated the terms of his parole, and on July 1, 1996, his parole was revoked and he was re-incarcerated. At the time of trial, A.L.S. was nearly five years old. In those five years, Becker had seen his daughter a total of eighteen days.

From the time of her birth, A.L.S. was placed by her mother, Misty Sinks, with various other people, including Sinks' mother, grandmother and friends. During this time, Sinks lived with different boyfriends and there were allegations of sexual abuse of the child. In July 1997, with Sinks' approval, A.L.S. began living with Thomas and Nancy Campbell—long-time friends of the Sinks family who happened to be investigating adoption opportunities. Although Sinks initially agreed to terminate her rights and allow the Campbells to adopt A.L.S., she changed her mind around Halloween and picked up her

daughter. By February 1998, Sinks decided that it would be best for her daughter if the Campbells adopted her, and she voluntarily terminated her rights.[2] On November 23, 1998, a petition to terminate Becker's parent-child relationship was filed, alleging (1) that he had failed to support the child in accordance with his ability during a period of one year ending within six months of the date suit was filed; (2) that he had voluntarily left the child alone in the possession of another not a parent and expressed an intent not to return without providing adequate support for the child and remained away for at least three months; (3) that he had voluntarily left the child alone or in the possession of another without providing adequate support and remained away for a period of at least six months; (4) and that he knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endangered the physical or emotional well-being of the child and/or around persons who engaged in conduct that endangered the physical or emotional well-being of the child. On June 23, 1999, the Campbells supplemented the petition adding the additional ground that Becker had engaged in criminal conduct that resulted in his imprisonment and inability to care for the child for not less than two years from the date of filing.

At trial, Becker contended that he could discharge his parental responsibility to care for his daughter by placing A.L.S. with his stepmother, Michell Berryhill, during the remainder of his incarceration. Berryhill testified that she and her husband were willing to provide a home for the child, but Berryhill had never met A.L.S., had never talked to her on the

2. Sinks executed an affidavit of relinquishment on February 25, 1998. The termination was granted by written order of the court on February 1, 1999.

telephone, and understood that uprooting her "might be a little bit disruptive."

In terminating Becker's parental rights, the trial court found, by clear and convincing evidence, that Becker had failed to support the child in accordance with his ability during the requisite period of time,[3] that he knowingly engaged in criminal conduct that resulted in his imprisonment and inability to care for the child for not less than two years from the date the petition was filed,[4] and that termination was in the best interest of the child. On appeal, Becker complains that the evidence is legally and/or factually insufficient to support either statutory predicate for termination. He does not complain of the trial court's finding that termination was in his daughter's best interest. Consequently, we must determine whether the evidence supports the finding of non-support or incarceration resulting in his inability to care for A.L.S. If the evidence supports either statutory prong, the termination must be affirmed.

## II. *DISCUSSION*

 The natural right that exists between parents and their children is one of constitutional dimension. *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Clark v. Dearen*, 715 S.W.2d 364, 366 (Tex.App.-Houston [1st Dist.] 1986, no writ). For this reason, statutes authorizing involuntary termination are construed in favor of the parent and any effort by the State to terminate the relationship is strictly scrutinized. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *Ybarra v. Texas Department of Human Services*, 869 S.W.2d 574, 576 (Tex. App.-Corpus Christi 1993, no writ); *Clark*, 715 S.W.2d at 368. The Texas Family Code sets forth the statutory grounds

upon which the court may involuntarily terminate a parent-child relationship. TEX. FAM.CODE ANN. § 161.001 (Vernon Supp.2001). In addition to establishing one or more of the grounds under Section 161.001(1), the petitioner must establish that termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001(2) (Vernon 1996). Each of the above elements must be established by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001; *see Holick*, 685 S.W.2d at 20; *In the Interest of B.R.*, 950 S.W.2d 113, 117 (Tex.App.-El Paso 1997, no writ). "Clear and convincing evidence" means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX. FAM.CODE ANN. § 101.007 (Vernon 1996 and Vernon Supp.2001); *In the Interest of B.R.*, 950 S.W.2d at 117. It is an intermediate standard of proof, falling between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In the Interest of B.R.*, 950 S.W.2d at 117.

### A. *Standard of Review*

 In conducting a factual sufficiency review where the burden of proof at trial was by clear and convincing evidence, we apply a heightened standard of review. *Hann v. Texas Department of Protective and Regulatory Services*, 969 S.W.2d 77, 81 (Tex.App.-El Paso 1998, writ den'd) (citing *In the Interest of B.R.*, 950 S.W.2d 113, 118-19 (Tex.App.-El Paso 1997, no writ)). After considering all of the evidence, we must determine whether the trier of fact could reasonably conclude that the existence of a fact was highly probable. *In the Interest of B.R.*, 950 S.W.2d at 119. Un-

---

3. TEX. FAM.CODE ANN. § 161.001(1)F) (Vernon 1996 and Vernon Supp.2002).

4. TEX. FAM.CODE ANN. § 161.001(1)Q) (Vernon Supp.2002).

der this standard, we must consider whether the evidence was sufficient to produce in the mind of the fact finder a firm belief or conviction as to the truth of the allegations sought to be established. We will sustain an insufficient evidence point of error only if the fact finder could not have reasonably found the fact was established by clear and convincing evidence. *In the Interest of B.R.*, 950 S.W.2d at 119 (citations omitted). "Even applying the heightened standard of review which we have adopted, a factual sufficiency point requires us to examine all of the evidence in determining whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust." *Hann*, 969 S.W.2d at 82.

▆▆▆▆ Although we use a heightened standard of review for factual sufficiency challenges, we use the traditional standard of review for legal sufficiency challenges. *See Edwards v. Texas Department of Protective and Regulatory Services*, 946 S.W.2d 130, 137 (Tex.App.-El Paso 1997, no writ). An appellate court considers only the evidence which tends to support the jury's findings and disregards all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965); *Worsham Steel Co. v. Arias*, 831 S.W.2d 81, 83 (Tex.App.-El Paso 1992, no writ). If any probative evidence supports the jury's determination, it must be upheld. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951); *Neily v. Aaron*, 724 S.W.2d 908, 913 (Tex.App.-Fort Worth 1987, no writ). In a bench trial, findings of fact are the equivalent of a jury answer to the special issues. *Lindsey v. Lindsey*, 965 S.W.2d 589, 591 (Tex.App.-El Paso 1998, no pet.).

## B. *Criminal Conduct Resulting in Imprisonment*

Becker complains that the evidence is legally and factually insufficient to support the trial court's finding that he knowingly engaged in criminal conduct that resulted in his imprisonment and inability to care for his child for not less than two years from the date of the filing of the petition to terminate his parental rights. His argument encompasses two subpoints. First, he contends that a plain reading of the statute indicates that any conduct committed before the child was conceived cannot be used to support termination, that there was no evidence of any criminal conduct after 1993, and that his incarceration resulted from mere "technical violations of probation conditions." Second, he maintains that the evidence demonstrates that he will be released from incarceration on February 7, 2000, which is approximately fifteen months from the filing of the petition and less than the two years required by statute.

▆▆▆▆ Before addressing these specific issues, we pause to note that Becker has not raised three other issues which would be relevant to our analysis. He does not complain that all of the evidence of criminal conduct, including the original burglary and forgery as well as the subsequent probation and parole violations, occurred prior to September 1, 1997, the effective date of the statute. He does not argue that Section 161.001(1)(Q) as applied to him operates as an unconstitutional *ex post facto* law.[5] And finally, he does not contend that the Campbells failed to prove that placement of A.L.S. with Berryhill would not satisfy Becker's parental duty to care for the child.[6] We will not reverse on

---

**5.** *See In the Interest of A.V. and J.V.*, 57 S.W.3d 51 (Tex.App.-Waco 2001, pet. filed).

**6.** *See In re Caballero*, 53 S.W.3d 391 (Tex. App.-Amarillo 2001, pet. denied).

the basis of unassigned error. *Security Southwest Life Ins. Co. v. Gomez*, 768 S.W.2d 505 (Tex.App.-El Paso 1989, no pet.) (citing *American General Fire and Casualty Company v. Weinberg*, 639 S.W.2d 688 (Tex.1982)).[7]

### 1. Evolution of the Statute

Prior to 1997, the courts had consistently maintained that incarceration in and of itself would not support termination, but when coupled with other factors it could rise to the level of abandonment or endangerment. *Tex. Dept. of Human Svcs. v. Boyd*, 727 S.W.2d 531, 533 (Tex.1987). In 1997, the Legislature amended Section 161.001(1) to add subsection (Q), which originally provided that the parent-child relationship could be terminated upon a finding by clear and convincing evidence that the parent had:

> (Q) knowingly engaged in criminal conduct that results in the parent's imprisonment and inability to care for the child for not less than two years from the date of filing the petition.

TEX. FAM.CODE ANN. § 161.001(1)(Q) (Vernon Supp.2001).[8] As is the case with any recent legislation, there is a dearth of cases interpreting the statute.

### 2. Criminal Conduct or Technical Violations of Probation/Parole?

We begin our analysis with *In the Interest of A.R.R.*, 61 S.W.3d 691 (Tex.

App.-Fort Worth 2001, pet. filed). A.R.R. was born in 1985. In 1991, her father, Earl Alan Rosenfeld, pled *nolo contendere* to a charge of sexual assault of the child's older sister and was placed on five years' probation. When he violated seven of the terms of probation, it was revoked and he was incarcerated in 1996. In finding the evidence sufficient to terminate his rights under Section 161.001(Q), the court observed that Rosenfeld could have prevented his imprisonment by refraining from sexually assaulting A.R.R.'s sister or "simply by following the terms of his probation." *Id.*

> Appellant testified that he was aware of the terms of his probation, and that he knew that if he violated them, he would be sent to prison. However, Appellant testified that despite his knowledge of the consequences, he 'never showed up for probation' because he 'felt it was unjust.'

*Id.* Becker testified similarly. The record indicates that by October 1993, three months after he was sentenced to ten years' probation, he had failed to report as required. Shortly after his daughter's birth in July 1994, Becker's probation was amended to require that he serve twelve months in the Restitution Center. By December of that year, the State had filed a motion to revoke alleging he had absconded from the Restitution Center. Eighteen

---

**7.** We recognize that the Waco court has determined that in termination cases, procedural due process requires that the court review unpreserved sufficiency complaints and unpreserved complaints concerning charge error. *See In the Interest of A.P. and I.P.*, 42 S.W.3d 248 (Tex.App.-Waco 2001, pet. filed); *In re J.F.C., A.B.C., and M.B.C.*, 57 S.W.3d 66 (Tex.App.-Waco 2001, pet. filed). In both of those cases, the complaints—although not preserved in the trial court—were assigned as error on appeal.

**8.** Subsection (Q) was amended in 1999 to provide:
> (Q) knowingly engaged in criminal conduct that has resulted in the parent's:
> (i) conviction of an offense; and
> (ii) confinement or imprisonment and inability to care for the child for not less than two years from the date of filing of the petition.

*See* Acts 1999, 76th Leg., ch. 1390 § 18, eff. Sept. 1, 1999. Because suit was filed in 1998, we apply the former version of the statute. *See* Acts 1999, 76th Leg., ch. 1087 § 4.

other violations were added in January 1995. His probation was revoked on February 17, 1995.

Q: Now, sometime during the process you violated your probation and were sent to the penitentiary?

A: Yes, sir.

Q: How did you violate your probation and sent [sic] to the penitentiary?

A: Failure to report.

Q: All right. How long did you not report?

A: I'm not sure. I was working in Odessa and it was a hardship to take off from work to drive back and forth to Abilene.

Q: Did you make a telephone call to say you were working? Ten years probation allowed you to do that?

A: Yes, sir.

Q: There's no excuse for what, other than what you, violated your probation, is that right?

A: Yes, sir.

As a result of his probation revocation, he was sentenced to ten years' incarceration but the record indicates he served roughly a year. Within two months of his parole, he violated the terms of his release by failing to report.[9] Becker admitted that he violated the terms of his probation and parole knowing it could lead to his imprisonment:

Q: And you knew that any action you took to avoid losing your probation, parole or anything like that could cause you to be incarcerated for up to 2-years, didn't you?

A: I knew I could be incarcerated, but I wasn't for sure how long.

**9.** Becker testified at trial that he did not report because he was traveling to Levelland,

Q: A 10-year probation. You knew that violating probation, being incarcerated for up to 10-years [sic], didn't you?

A: Yes.

Q: And then on parole, you've been doing prison for a good while, if you violated your parole, away for more than 2-years [sic], didn't you?

A: Yes, sir.

We conclude that the evidence is sufficient to support a finding that Becker knowingly engaged in criminal conduct that resulted in his imprisonment. We turn now to a discussion of the statutory requirement that the Campbells prove Becker was imprisoned and unable to care for A.L.S. for not less than two years.

### 3. Calculation of the Statutory Two–Year Requirement

 Shortly after subsection (Q) was added to Section 161.001(a), commentators began to question the proper interpretation of the two-year requirement:

Similarly, there has been a good deal of litigation about the subject matter of Subsection (1)(Q), imprisonment as a ground for termination of parental rights. The ground is somewhat ambiguous because it is unclear whether it is the sentence of 'not less than two years' or whether the individual must actually be incarcerated for that length of time. For example, if an individual is sentenced to life imprisonment, may termination proceed immediately or must there be a two year delay before the ground is fully met and the termination may proceed?

SAMPSON & TINDALL'S TEXAS FAMILY CODE ANNOTATED, August 2001 ed., p. 761. Other commentators have noted:

Lubbock, and Odessa in order to locate A.L.S.

It is unclear whether courts should apply this ground only prospectively (i.e. when the parent's sentence will not expire for at least two years after the filing of the petition); or whether the courts may also consider any period of confinement that disrupts the parent-child relationship for no less than two years, assuming some portion of that two-year period is within two years preceding or following the filing of the petition. If applied to recent convictions requiring prospective confinement, opposing counsel is *sure* to raise issues such as the possibility of reversal on appeal, or the possibility of early parole. If applied only to sentences *already served*, courts may have to render a final order under the new 12–month time frame before the two year period of imprisonment has passed. (Emphasis original).

Phoebe Knauer, Pamela K. Parker & Cathren Page Koehlert, *Grounds for Termination of Parental Rights*, State Bar Section Report Family Law, 6 Vol.2000–4 at 17.

The commentators posed good questions and the courts have struggled to answer them. We again begin our analysis with *In the Interest of A.R.R.*, 61 S.W.3d 691 (Tex.App.-Fort Worth 2001, pet. filed). In considering the father's appeal, the court noted that since it was undisputed he had been convicted of and imprisoned for engaging in criminal conduct, it need only decide whether the imprisonment resulted "in his inability to care for A.R.R. *for at least two years before the 1999 filing of the petition.*" *Id.* at 700 (Emphasis added). There was nothing in the record before the court that the father had cared for his daughter at any time after 1991, much less that he cared for or arranged to have her cared for during the three years he was jailed before the 1999 proceeding. Noteworthy is the fact that the petition was

filed by the Texas Department of Public Safety (DPRS) on October 4, 1999 and the termination order entered on December 22, 2000. The conclusion to be drawn is that the two years may be counted *backward* from the date the petition is filed. Certainly the opinion demonstrates that A.R.R.'s father had not been incarcerated for two years between the date of filing and the date the termination order was entered. And while the father had requested to remain in prison for the full term of his sentence—which would end in 2005—he was already eligible for parole. *Id.* at 693.

The Waco Court of Appeals considered the statute in *In the Interest of A.V. and J.V.*, 57 S.W.3d 51 (Tex.App.-Waco 2001, pet. filed). In 1993, Pablo Puig was convicted of a federal drug offense and sentenced to 100 months in prison. While he was incarcerated, DPRS began an investigation into the living arrangements of his wife and children. Puig attempted to break out of prison in order to care for his sons, but when his attempt failed, he was sentenced to an additional forty months. His projected release date was June 2003. By 1997, DPRS had been named temporary managing conservator and the children were placed in foster care. On April 28, 1998, DPRS sought to terminate the parental rights of both Puig and his wife. Trial began on January 18, 2000 and by order dated January 26, 2000, Puig's rights were terminated pursuant to Section 161.001(1)(N) and (Q). On appeal, Puig contended that subsection (Q), as applied to him, operated retroactively to disturb his parental rights because the two-year requisite time period included time which was prior to the effective date of the statute. The appellate court agreed:

The subsection went into effect on September 1, 1997. The amended petition was filed on April 23, 1998. *The appli-*

*cable time period is two years before the petition was filed.* Thus the two-year period extended retroactively almost sixteen months before "Q" was effective. If the petition had been filed on or after September 1, 1999, the law would not have been retroactive as to Pablo.

*Id.* at 60 (Emphasis added). We find this language relevant not for its holding that subsection (Q) was an unconstitutional retroactive law as applied to Puig but because of its holding that the statute should be construed as measuring the requisite two-year time period *backward* from the date the petition was filed.

Finally, we recognize that another sister court has concluded that the statute applies prospectively only:

We interpret this provision to mean that a person's parental rights may be terminated if the person knowingly engages in criminal conduct that results in his imprisonment and he is unable to care for the child for at least two years from the date the termination petition is filed. Here, the petition was filed on April 8, 1999. Therefore, appellee was required to prove *that appellant would be incarcerated* until at least April 8, 2001. (Emphasis added).

*In re I.V.,* 61 S.W.3d 789, 798 (Tex.App.-Corpus Christi 2001, no pet.). Thus, the intermediate courts are in conflict as to whether the two-year imprisonment requirement may be satisfied by incarceration for two years *before* the petition is filed, or by incarceration for two years *after* the petition is filed.

The language we have highlighted from *In re I.V.* is troublesome. It reinforces the questions posed by commentators concerning the possibility that a conviction might be reversed on appeal or that an inmate might be granted early release. To eliminate speculation, one could argue that the petitioner must wait two years

between the date the petition is filed and the date termination is ordered. That argument is problematic for two reasons. First, sheer docket control and concerns for case management and performance measures dictate against such an interpretation. Second, Section 161.001 provides the statutory requisites for terminating the parent-child relationship, regardless of whether the suit is brought by a private individual or government agency. Consequently, our construction of subsection (Q) must apply in both instances. Although the termination suit here was initiated by the Campbells, we must define the parameters of subsection (Q) so that it is workable even had the suit been initiated by DPRS, which as temporary managing conservators of the child, placed A.L.S. in foster care with the Campbells. This is significant because Chapter 263 of the Family Code implements a basic one-year deadline for lawsuits in which the state intervenes in a family. Cynthia Bryant & Charles G. Childress, *Introductory Comment to Chapter 263,* SAMPSON & TINDALL at 949. In termination suits filed by DPRS, the clock starts ticking on the date the court enters a temporary order appointing the department as the child's temporary managing conservator. *Id.* The court must resolve the case by final order by the first Monday after the first anniversary of the temporary order. If there is no final order by then, or by 18 months if the court grants an extension no longer than six months, the department's suit must be dismissed. *Id.* If the department places the child in foster care, a permanency plan shall be prepared and an initial permanency hearing shall be conducted no later than the 180th day after the date the temporary order is signed. TEX. FAM.CODE ANN. § 263.304 (Vernon Supp.2001). The court shall set a final hearing date that will allow the court to render a final order before the

date for dismissal. *Id.* A subsequent permanency hearing before entry of a final order shall be held not later than the 120th day after the date of the last permanency hearing in the suit. TEX. FAM.CODE ANN. § 263.305 (Vernon Supp.2001). The permanency hearings are designed to bring the case to the attention of the trial court several times before the absolute dismissal deadline. Charles G. Childress, *Comment to Section 263.305*, SAMPSON & TINDALL at 957. These statutes focus on the one-year time limit for foster care as well as on the child's prospects for permanent placement. Cynthia Bryant and Charles G. Childress, *Comment to Section 263.306*, SAMPSON & TINDALL at 958–59.

 In this case, suit was filed on November 23, 1998. Had that been the date that a temporary order appointing DPRS as temporary managing conservator were entered, a final order would be required by November 29, 1999. If incarceration is to be considered prospectively and a court is to only consider time served, DPRS could never terminate parental rights under Section 161.001(1)(Q).

 Becker was imprisoned in July 1996. He had been incarcerated for more than two years at the time suit was filed in November 1998 and for three years by the time of trial in July 1999. We adopt the statutory intepretation expressed by both the Fort Worth and Waco courts which requires a petitioner to prove that a respondent knowingly committed criminal conduct resulting in his imprisonment and inability to care for the child for at least two years prior to the date the petition is filed. The Code Construction Act[10] provides that in enacting a statute, it is presumed that the entire statute is intended to be effective and that a just and reasonable result is intended. Section 311.023 provides that in construing a statute, a

court may consider the object sought to be attained, circumstances under which the statute was enacted, and the consequences of a particular construction. We are not to construe a statute in a manner that will lead to a foolish or absurd result when another alternative is available. *Del Indus., Inc. v. Texas Workers' Compensation Ins. Fund,* 973 S.W.2d 743, 747 (Tex.App.-Austin 1998), *aff'd.* 35 S.W.3d 591 (Tex. 2000).

### *CONCLUSION*

We conclude that the evidence is factually sufficient to support the trial court's finding under Section 161.001(1)(Q). Consequently, we need not address whether termination was proper under Section 161.001(1)(F). Because Becker does not challenge the trial court's finding that termination was in the best interest of the child, we affirm the judgment of the trial court.

---

**10.** TEX. GOV'T.CODE ANN. § 311.021 (Vernon 1988).