NO. 07-07-0109-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

DECEMBER 29, 2009

______________________________


In the Interest of J.H.M., 
 
                                                                                                 A Child

_________________________________

FROM THE COUNTY COURT AT LAW NO. 1 OF LUBBOCK COUNTY;

NO. 2004-526,287; HON. LARRY B. LADD, PRESIDING
_______________________________
Memorandum Opinion
_______________________________

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ. 
          Stacy Hayes (Hayes) and Harold Short (Short), parents of J.H.M., appeal the order
terminating their parental rights. Hayes contends, through twelve issues, that 1) she was
denied due process, 2) the trial court erred in the admission and exclusion of evidence, 3)
the trial court erred in failing to hold a hearing on her motion for new trial and by failing to
grant same, 4) the trial court erred in failing to grant her motion for directed verdict and her
motion for JNOV because the evidence was insufficient, 5) she was denied a fair and
impartial trial due to jury misconduct, 6) the trial court erred by allowing a trial amendment
on the day of trial and again on the sixth day of trial; and by denying a motion for
continuance based on surprise of same, 7) the trial court erred by dismissing veniremen
for bias and economic hardship, 8) the trial court erred by allowing the guardian ad litem
for J.H.M. to testify in violation of the Texas Family Code, and 9) it was an abuse of
discretion to allow broad form submission to the jury.
          Short contends that the trial court abused its discretion by 1) allowing a trial
amendment after trial had started, 2) allowing the guardian ad litem to make
recommendations in violation of the Texas Family Code, 3) by using broad form
submission and 4) the evidence was insufficient to support termination of his parental
rights. We affirm.
Background
          As evidenced in the record, Hayes had her first child, G.L., when she was
seventeen. The pregnancy was a result of a sexual assault for which the perpetrator was
convicted and sentenced to prison. Hayes is hearing impaired and requires hearing aids
in both ears which according to her has been an obstacle at times in her life. In 1996,
Hayes married Stewart Lujan (Lujan), who is also hearing impaired, and a second child
was born to Hayes, L.L. This marriage was volatile and included periods of separation. 
It was during a period of separation that Hayes had a relationship with Short. This
relationship began in late December 1998 and ended in either late February or early March
of 1999. Hayes testified that she had become pregnant during this relationship and she
advised Short of this situation. According to Short, he was told by Hayes that she was
pregnant but that it was a tubal pregnancy and she would have to terminate the pregnancy. 
Shortly thereafter, Short moved to Austin and Hayes reconciled with Lujan. Subsequently,
in 2003, Short was convicted and sentenced to prison for burglary. He remained
incarcerated at time of trial. J.H.M., the subject of this suit, was born on October 28, 1999. 
According to Short, he did not know about the birth at the time the child was born and later
found out through Hayes after the petition to terminate her rights was filed. A subsequent
paternity test proved that Short was the biological father of J.H.M.
          At some point in 2000 or 2001, Hayes and Lujan became separated and Lujan
moved to New Mexico. In 2001, Hayes began seeing another man by the name of Joe
Gomez. This relationship too proved to be volatile and in March of 2001, Child Protective
Services (CPS) stepped in to remove G.L., the oldest child, from Hayes’ home. This
removal came about after CPS had offered Hayes a place at a women’s shelter to protect
her and her children from abuse from Gomez. Hayes refused and remained with Gomez. 
Finally, they were evicted from the home where they had been living. Allegations were
then made concerning abuse to G.L. and CPS opened a case on her. Upon arrival, CPS
found J.H.M. and L.L. sick, having both vomit and diarrhea in the playpen. According to
the parties, at this time, CPS agreed not to open a case on L.L. and J.H.M. if Hayes
voluntarily agreed to place the children outside her home. G.L. was placed by CPS with
Hayes’ mother, Janice Short. Hayes agreed to place the other two girls with Methodist
Childrens Home (Methodist). L.L. was three years old and J.H.M. was seventeen months
old at the time. Upon receiving the girls, Methodist, then contacted the Schreibers about
placing the girls with them. The Schreibers requested a week in order to get the house
ready for the girls. For a week, L.L. and J.H.M. lived with Robin McGrew. McGrew testified
that when she received the children, they were filthy and hungry. Furthermore, they both
had bad cases of lice. 
          While under CPS’ care, Hayes continued to see Gomez and once tested positive
for cocaine and marijuana. Furthermore, she refused to work with CPS for a long period
of time because she did not want to “get rid of Joe Gomez.” However, in 2003, after she
was no longer seeing Gomez, Hayes began dating Tom Sekander which ended when he
moved to Dallas in 2004. During her relationship with Sekander, Hayes suffered eviction
and sporadic employment. Around the time Sekander and Hayes split up in 2004, Hayes
began emailing a man in Ireland by the name of John Hayes who became her present
husband. They purchased webcams and spoke every day. He came to the United States
in December of that year and bought a house for himself and Hayes. Earlier that year in
June, L.L. and G.L. had been returned to Hayes. In September of 2005, the couple was
married, and about a year later they had a child. In the summer of 2006 all three left to
visit Ireland. Hayes had sent G.L. and L.L. to New Mexico for summer visitation with Lujan. 
While in Dallas, Hayes received a call from Lujan’s girlfriend that he and she were fighting
and that he had left her alone with the girls. The girlfriend asked that Hayes come and get
the girls; however, Hayes refused since they had already purchased the tickets to Ireland. 
Hayes was also informed that the girls had to be taken to the doctor due to bad cases of
lice and that G.L. had a vaginal infection. Hayes left on her trip to Ireland for two weeks.
          J.H.M.’s placement continued with the Schreibers throughout this time period. They
had been married for over twenty years and both had received college educations. Paul
Schreiber (Paul) worked in the insurance business and Debbie Schreiber (Debbie) had
worked as a dietician in the past but at time of trial was staying at home with J.H.M. They
had no children of their own and had become interested in becoming foster parents
through McGrew who they knew through their church. The Schreibers had contacted
Methodist where McGrew was a foster parent and completed the process and
requirements set out to become foster parents. Prior to taking in J.H.M. and L.L, the
Schreibers had provided care to other children. As testified to at trial, most foster care
placements through Methodist last approximately three to six months. 
          When the Schreibers first received J.H.M. and L.L., the girls were filthy and “pitiful.” 
They both had runny noses which later turned out to be severe infections resulting in both
girls having tubes placed in their ears. J.H.M. had no shoes at the time of placement. The
Scheibers stayed in constant contact with CPS who advised they would probably be
“attaching” the girls to G.L.’s case due to Hayes refusal to cooperate with CPS. According
to Paul, in 2003, Hayes advised him that she wanted the Schreibers to adopt the two girls
if CPS were to open cases on them since the girls had lived with them for two years. Paul
observed on visits that there was a bond between L.L. and Hayes but not so with J.H.M. 
Mostly J.H.M. was left to play by herself while attention was paid to L.L. 
          The Schreibers continued to receive reports that Hayes was not meeting her goals
set by CPS and Methodist and they decided legal action needed to be taken to give the
girls permanency and stability. During this period of time from 2001 to 2004, Hayes had
moved several times due to her inability to pay rent and subsequent eviction. She was
unable to hold a job for very long periods of time and received welfare. However, after
Hayes married John and acquired a home, CPS and Methodist decided to return all the
girls to her. Paul had spoken to L.L.’s father, Lujan, and was advised by him that he
wanted to seek custody of L.L. Therefore, the Schreibers filed to be appointed managing
conservators, for termination and adoption of J.H.M. in May of 2004. At that time the
presumed father was Lujan, who voluntarily relinquished his rights to J.H.M. 
          During the pendency of the termination petition, Hayes contacted Short who was
incarcerated. She wrote Short and advised him to contact the Schreibers, their attorney
and the court advising that he was J.H.M.’s father and that he wanted to exercise his
parental rights. Pleadings were amended to include termination of Short’s rights. In
January of 2007, a jury trial was held and the jury in an eleven to one decision terminated
Hayes’ and Short’s parental rights to J.H.M. They both appeal that decision.
Hayes Appeal
Issue One - Due Process
          In her first issue, Hayes contends that she was denied due process. This is so
according to Hayes because 1) the Schreibers lacked standing, 2) the Schreibers’ action
of filing a petition for termination violated their contract with Methodist and was
unconscionable, 3) the Schreibers lacked a justiciable interest and failed to overcome the
parental presumption in favor of family reunification, and 4) use of the broad form
submission was not feasible in this case. We overrule the issue.
          Standing
          The question of standing to bring an original suit affecting the parent-child
relationship seeking managing conservatorship is a threshold issue. See In re SSJ-J, 153
S.W.3d 132, 134 (Tex. App.–San Antonio 2004, no pet.). This is because standing is
implicit in the concept of subject matter jurisdiction. Texas Ass'n of Bus. v. Texas Air
Control Bd., 852 S.W.2d 440, 443 (Tex. 1993). Standing is a question of law and we
review the issue de novo. See In re SSJ-J, 153 S.W.3d at 134. As with an order of
dismissal for lack of subject matter jurisdiction, we review an order of dismissal for lack of
standing by construing the pleadings in favor of the plaintiff and must look to the pleader's
intent. Texas Ass'n of Bus. v. Texas Air Control Bd., 852 S.W.2d at 446. However, a court
deciding a plea to the jurisdiction is not required to look solely to the pleadings but may
consider evidence and must do so when necessary to resolve the jurisdictional issues
raised. Bland Indep. Sch. Dist. v. Blue, 34 S.W.3d 547, 555 (Tex. 2000).
          Foster parents now have a couple of avenues to the courthouse. Under §102.003
of the Family Code, they can bring an original suit affecting the parent-child relationship
(SAPCR) if the child was placed with them by the “Department of Protective and
Regulatory Services” and has lived with them "for at least [twelve] months ending not more
than [ninety] days preceding the date of the filing of the petition." Tex. Fam. Code Ann.
§102.003(a)(12) (Vernon Supp. 2009). Under §102.005 of the same Code, foster parents
who have not had possession of the child for at least twelve months, ninety days before
they file suit may nevertheless have standing to request termination and adoption if they
have “had actual possession and control of the child for not less than two months during
the three month period preceding the filing of the petition.” Id. §102.005(3). In the case
at bar, the Schreibers filed a petition for termination which was joined with a petition for
adoption. The record reflects that they had actual possession of J.H.M. for thirty-nine
months prior to the filing of their petition for termination and adoption on June 2, 2004, prior
to the entry of the July 16, 2004 temporary orders, which period meets the time
requirement specified in the Family Code. See id.
          Hayes, further, contends that the Schreibers, for purposes of §102.005(3), were only
“contract employees of Methodist . . .” and that they were only given limited control over
the child. However, we do not find that the statute makes the distinction Hayes now
argues. Nor does she cite us to any authority interpreting the statute in that manner. 
Rather, §102.003(a)(12) allows the Schreibers to file for termination of the parental
relationship and the adoption of J.H.M. In re H.G., 267 S.W.3d 120, 123 (Tex. App.–San
Antonio 2008, no pet.) (holding that when standing has been statutorily conferred, the
statute itself serves as the proper framework for a standing analysis). 
          Unconscionability
          Hayes next contends that the Schreibers’ action of seeking to terminate the parent-
child relationship contradicted their contract with Methodist. Thus, their conduct was
unconscionable. This purportedly is so because the doctrine of quasi-estoppel prevents
a party from asserting a right inconsistent with a position previously taken by him. Here,
according to Hayes, she relied on the assurances of the Schreibers evidenced by her
working to better her home situation for her children. However, Hayes failed to raise this
defense in her pleadings; therefore, it was waived.


 In re J.M., 156 S.W.3d 696, 705 (Tex.
App.–Dallas 2005, no pet.) (holding that estoppel is an affirmative defense that must be
pled; if it is not, then it is waived).             
          Hayes next asks us to “carve out another appropriate exception to standing,
disallowing standing where foster parents have unlawfully restrained a child from a parent
or private foster placement agency, when the foster parents only have possession under
the terms of a non-adoption placement agreement.” However, Hayes failed to allege this
alternate ground of estoppel in her pleadings. Nor did she request that the issue be
submitted to the jury; therefore, the matter was waived. See Harris County Child Welfare
Unit v. Caloudas, 590 S.W.2d 596 (Tex. Civ. App.–Houston [1st Dist.] 1979, no writ)
(holding that Harris County had failed to plead the theory that the foster parents had signed
a contract specifically forbidding the adoption; therefore, the complaint was waived).
          Justiciable Interest and Parental Presumption
          Next, Hayes argues that the Schreibers lacked a justiciable interest and failed to
overcome the parental presumption in favor of family reunification. According to Hayes,
because her other two children were placed back with her, she enjoyed the strong parental
presumption favoring reunification. However, the Schreibers had a justiciable interest
granted them under §102.005 of the Texas Family Code. 
          J.H.M. had been with the Scheibers since she was seventeen months old in 2001. 
In 2004, over three years later, they were still raising the child when they sought
termination of the parental relationship. Therefore, we find that they had a justiciable
interest and, thus, standing to petition for termination. See Rodarte v. Cox, 828 S.W.2d
65 (Tex. App.–Tyler 1992, writ denied) (the section of the Family Code in existence at the
time of suit gave the foster parents a justiciable interest in the subject matter of the suit).
          Regarding the matter of the presumption favoring reunification, it is rebuttable. Hall
v. Harris County Child Welfare Unit, 533 S.W.2d 121, 122-23 (Tex. Civ. App.–Houston [14th
Dist.] 1976, no writ). And, the evidence of record clearly and convincing supports the jury’s
rejection of it here. 
 
 
          Broad Form Submission
          Finally, Hayes contends that her due process rights were denied because
extraordinary circumstances existed which prevented the broad form submission from
being feasible. Such a submission, according to Hayes, allowed the Schreibers to “avoid
their burden of proof, engage in burden shifting to the biological parents, and engage in
trial by mud-slinging in order to try to get the jury to make a decision. . . .” 
          Controlling Texas case law specifically authorizes broad form submission in parental
rights cases. See Tex. Dep't of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990)
(op. on reh'g); see also J.T.G., 121 S.W.3d 117, 128-29 (Tex. App.–Fort Worth 2003, no
pet.) (applying E.B. to uphold jury findings on grounds for termination when multiple
grounds for termination were sought and the trial court submitted the issue using a broad
form question). Furthermore, it is well-settled law that a jury charge that tracks the
statutory language and then asks the controlling question does not amount to an abuse of
discretion. Tex. Dep’t of Human Servs. v. E.B., 802 S.W.2d at 649. In parental termination
cases, the controlling question is whether the relationship between the parent and each
child should be terminated. Id. Here, we find that the charge as submitted tracked the
statutory language, asked the controlling question, and assisted the jury in reaching the
verdict. 
Issue Two - Admission of Evidence
          In her second issue, Hayes contends the trial court erred in allowing Short to ask
about information contained in documents from the Texas Department of Correctional
Justice pertaining to himself. According to Hayes, the Schreibers attempted to introduce
records from prison concerning Short and incidents that occurred while he was
incarcerated. The trial court excluded the documents themselves and, according to Hayes,
ordered that “none of the records or the information in the records in any way should be
brought before the jury.” (Emphasis in original). We overrule the issue.
          The decision whether to admit evidence rests within the discretion of the trial court. 
E.I. du Pont de Nemours and Co., Inc. v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995). A
court abuses its discretion when it rules on the admissibility of evidence in an arbitrary or
unreasonable manner or without reference to guiding legal principles or rules. Downer v.
Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985). We must uphold a trial
court's evidentiary ruling if there is any legitimate basis in the record to do so. 
Owens-Corning Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43 (Tex. 1998). Finally, to be
entitled to reversal due to the erroneous admission of evidence, the appellant must not
only show that the trial court erred in admitting the evidence but also that the error was
reasonably calculated to cause and probably did cause the rendition of an improper verdict. 
In re C.R., 263 S.W.3d 368, 370 (Tex. App.–Dallas 2008, no pet.). 
          In the case before us, Short was testifying in response to questions regarding
conduct he had been cited for while in prison, specifically inappropriate sexual conduct. 
The trial court in a previous hearing had excluded any of the prison documents from
evidence. It further ruled that if a need arose for impeachment at trial, then the parties
could approach the bench and specifically identify to the court the record sought to be
used. Otherwise, the records would remain inadmissible. 
          The line of questioning that Hayes now complains of related to when Short was
eligible for parole and was denied it due to several bad conduct reports. However, the
record before us shows that Short had answered several questions regarding the denial
of his parole before an objection was lodged. This is problematic since the Texas Rules
of Appellate Procedure state that “as a prerequisite to presenting a complaint for appellate
review, the record must show that the complaint was made to the trial court by a timely
request, objection, or motion . . . .” Tex. R. App. P. 33.1(a)(1). Furthermore, an objection
is timely when made as soon as the ground for it becomes apparent. Lagrone v. State,
942 S.W.2d 602, 618 (Tex. Crim. App. 1997). So, if a party fails to object until after an
objectionable question has been asked and answered, and he can show no legitimate
reason to justify the delay, his objection is waived. Id. That was and is the situation here.
          Issues Three, Four and Nine - Motion for New Trial and Jury Misconduct
          In her third and fourth issues, Hayes contends the trial court erred by failing to hold
a hearing on her motion for new trial and by denying the motion. In her ninth issue, she
contends that she should be granted a new trial due to jury misconduct. We overrule all
three issues. 
          According to Hayes, jury misconduct occurred when one of the jurors had a
conversation with Paul while the trial was going on. This same juror also had a
conversation with the CASA representative. When the jury began deliberations, it was
brought to the jury’s attention that the juror who had a conversation with CASA had
received information regarding the case. Furthermore, the juror attended the same church
as the Schreibers and had contact with them at church. Because one of the allegations
in the motion for new trial pertained to jury misconduct, the trial court was required to hold
a hearing, according to Hayes. Furthermore, according to Hayes, because no one filed
controverting affidavits, the allegations regarding jury misconduct must be taken as true. 
Therefore, Hayes purportedly was entitled to a new trial since her motion had to be
accepted as true, or at the very least, she was entitled to a hearing on it. 
          A new trial based on jury misconduct will be granted upon proof that: (1)
misconduct occurred; (2) it was material misconduct; and (3) based on the record as a
whole, the misconduct probably resulted in harm to the movant. See Tex. R. Civ. P.
327(a); Golden Eagle Archery, Inc. v. Jackson, 24 S.W.3d 362, 372 (Tex. 2000). 
Furthermore, we review the trial court’s denial of a motion for new trial based on jury
misconduct for an abuse of discretion. Pharo v. Chambers County, Texas, 922 S.W.2d
945, 948 (Tex. 1996).
          In the case before us, an affidavit was attached to the motion for new trial. In the
affidavit, which document was executed by a private investigator who had spoken with
jurors after trial, it was represented that a juror had seen Paul and he spoke to her by
saying it was okay for her to say “hi.” The juror informed the rest of the jury about this
conversation. As previously stated, the misconduct must be material misconduct; we do
not deem the interchange at issue to rise to that level. Rule 226a of the Texas Rules of
Civil Procedure permits “casual greetings” between the participants and the jurors. Saying
“hi” falls into that category. 
          Next, the investigator’s affidavit represented that, during deliberations, the same
juror mentioned she had been in contact with CASA because she was supposed to begin
training as a CASA volunteer. According to the record, the trial court addressed this matter
in a hearing and was told that the juror called CASA because she was to start training as
a CASA volunteer and had advised them she would be unable to do so because of the
present case. The trial court determined that no discussion was had regarding the details
or evidence of the present case. Furthermore, the conversation occurred before the trial
started. 
          In sum, we cannot say that the trial court abused its discretion in either failing to hold
a hearing or grant the motion for a new trial. 
Issues Five, Six and Seven - Directed Verdict/JNOV and Insufficient Evidence
          In her fifth, sixth and seventh issues, Hayes contends that the trial court erred by
failing to grant her motion for directed verdict and her judgment notwithstanding the verdict
because the evidence was insufficient to support termination.


 We disagree and overrule
the issues.
          Hayes contends that the evidence is legally and factually insufficient to support
termination. The jury charge contained the following grounds for termination: that Hayes
1) voluntarily left the child alone or in the possession of another not the parent and
expressed an intent not to return; or 2) knowingly placed or knowingly allowed the child to
remain in conditions or surroundings that endanger the physical or emotional well-being
of the child; or 3) engaged in conduct or knowingly placed the child with persons who
engaged in conduct that endangers the physical or emotional well-being of the child; or 4)
failed to support the child in accordance with her ability during a period of one year ending
within six months of May 11, 2004, the date the termination was filed. The case was
submitted to the jury in broad form and, thus, we need to only find the evidence sufficient
to support a single ground for termination. See In re Z.C., 280 S.W.3d 470, 478 n.29 (Tex.
App.–Fort Worth 2009, pet. denied). 
          To terminate an individual’s parental rights, Texas law requires by clear and
convincing evidence that 1) the parent has engaged in one of the statutory grounds for
termination and 2) the termination is in the child’s best interest. Tex. Fam. Code Ann. §
161.001 (Vernon Supp. 2009). Next, §161.001(1)(D) authorizes termination of parental
rights of a parent who knowingly placed or knowingly allowed the children to remain in
conditions or surroundings which endangered the physical or emotional well-being of the
children.
          Endangerment is defined as exposing to loss or injury, to jeopardize. In re J.T.G.,
121 S.W.3d 117, 125 (Tex. App.–Fort Worth 2003, no pet.). Under subsection (D), it is
necessary to examine evidence related to the environment of the child to determine if the
environment was the source of endangerment to the child's physical or emotional
well-being. In re D.T., 34 S.W.3d 625, 632 (Tex. App.–Fort Worth 2000, pet. denied). A
child is endangered when the environment creates a potential for danger that the parent
is aware of but disregards. See In re S.M.L., 171 S.W.3d 472, 477 (Tex. App.–Houston
[14th Dist.] 2005, no pet.). Inappropriate, abusive, or unlawful conduct by persons who live
in the child's home or with whom the child is compelled to associate on a regular basis in
his home is a part of the "conditions or surroundings" of the child's home under subsection
D. In re W.S., 899 S.W.2d 772, 776 (Tex. App.–Fort Worth 1995, no writ) (stating that
"environment" refers not only to the acceptability of living conditions, but also to a parent's
conduct in the home). Furthermore, in determining endangerment of the child, courts may
look to parental conduct occurring both before and after the child's birth. In re M.J.M.L.,
31 S.W.3d 347, 351 (Tex. App.–San Antonio 2000, pet. denied). Conduct that subjects
a child to a life of uncertainty and instability also endangers the child's physical and
emotional well-being. See In re S.D., 980 S.W.2d 758, 763 (Tex. App.–San Antonio 1998,
pet. denied) (using illegal drugs and violating parole provided sufficient evidence of
endangerment). To "endanger" the physical or emotional well-being of a child means
"more than a threat of metaphysical injury or the possible effects of a less-than-ideal family
environment." Tex. Dep't. of Human Services v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987). 
However, it is not necessary that the conduct be directed at the child or that the child
actually suffer injury, so long as the conduct exposes the child to loss or injury. Id. Drug
use and its effect on a parent's life and his ability to parent may establish an endangering
course of conduct. In re A.J.H., 205 S.W.3d 79, 81 (Tex. App.–Fort Worth 2006, no pet.).
          Regarding the best interests of the child, the focus is on the child, not the parent. 
See In re R.F., 115 S.W.3d 804, 812 (Tex. App.–Dallas 2003, no pet.). However, there is
a strong presumption that it is in the child’s best interest to preserve the parent-child
relationship. Swate v. Swate, 72 S.W.3d 763, 767 (Tex. App.–Waco 2002, pet denied). 
In deciding whether to override this presumption, factors to be considered include: the
child’s desires; the child’s emotional and physical needs now and in the future; the
emotional or physical danger to the child now and in the future; the parenting abilities of
the individuals seeking custody; the programs available to assist those individuals to
promote the child’s best interest; the plans for the child by those individuals or the agency
seeking custody; the stability of the home or proposed placement; the parent’s acts or
omissions that may indicate that the existing parent-child relationship is not a proper one;
and any excuse for the parent’s acts or omissions. Holley v. Adams, 544 S.W.2d 367, 372
(Tex. 1978) (the Holley factors). Also, permanence is of paramount importance in
considering a child’s present and future needs. Dupree v. Texas Dep’t of Protective &
Regulatory Servs., 907 S.W.2d 81, 87 (Tex. App.–Dallas 1995, no pet.).
          Finally, the applicable standards of review are explained in In re J.F.C., 96 S.W.3d
256 (Tex. 2002) and In re C.H., 89 S.W.3d 17 (Tex. 2002). Through them, and when
addressing a factual sufficiency complaint, we are told to determine whether, after
assessing the entire record, the evidence permits a factfinder to reasonably form a firm
belief or conviction about the truth of the State's allegations. In re J.F.C., 96 S.W.3d at
266; In re C.H., 89 S.W.3d at 25. Unlike the situation wherein the legal sufficiency of the
evidence is in question, our focus is not simply upon the undisputed evidence that supports
the verdict, but the disputed evidence as well. In re J.F.C., 96 S.W.3d at 266. Implicit in
the standard is our obligation to accord the factfinder the deference needed for it to fulfill
its role. In re C.H., 89 S.W.3d at 25-26. Furthermore, if the evidence is factually sufficient,
then, it is also legally sufficient. This is so because, logically, there cannot be "no
evidence" of record if the record contains enough evidence to enable the factfinder to
reasonably form a firm belief or conviction as to the existence of pivotal facts.
          In the case at bar, J.H.M. , at seventeen months, was behind on her immunizations,
was speech delayed, and had serious infections in her sinuses, throat and ears. She was
seen by an ear, nose and throat specialist and was found to be in need of surgery. Hayes
failed to attend this surgery even though she was aware of same. Furthermore, Hayes
refused to leave or stop seeing Gomez who was abusive to her and to at least one of her
children, G.L. During the time with CPS, Hayes tested positive for ingesting cocaine and
marijuana. She also was evicted several times and refused to work with CPS or Methodist
in order to reunify the family. She was unable to maintain gainful employment and was in
trouble financially. According to the evidence, she also was exercising her visitations with
J.H.M. while an active arrest warrant for issuance of a bad check pended against her. So
too did the evidence show that she continued to associate with individuals who abused
drugs and who were unable to maintain a stable lifestyle for her or her children. One of
those individuals was Short, with whom she had an affair while married and who has been
in prison twice. Additionally, the two girls who were sent home to live with Hayes were
found to have lice, and one also began to suffer from an untreated vaginal infection with
a foul smelling discharge. 
          Given the record, we conclude that the evidence, viewed in the light most favorable
to the section 161.001(1)(D) finding, was sufficiently clear and convincing that a reasonable
factfinder could have formed a firm belief or conviction that Hayes knowingly placed or
knowingly allowed J.H.M. to remain in conditions or surroundings which endangered the
physical or emotional well-being of the child. We further conclude that, viewed in light of
the entire record, any disputed evidence could have been reconciled in favor of the §
161.001(1)(D) finding or was not so significant that the factfinder could not reasonably have
formed a firm belief or conviction that the elements of subsection D were shown.
Accordingly, we hold that the evidence was legally and factually sufficient to support the
section 161.001(1)(D) finding.
          Concerning the matter of best interests, the record shows that 1) J.H.M. wanted to
live with the Schreibers and her sister, L.L., 2) since being with the Schreibers, she began
to excel in school and was reading one to two levels ahead of her grade while before she
was speech delayed, 3) J.H.M. suffers from Perthes disease which is a degenerative
disease that may result in surgery, 4) after visitations with Hayes, J.H.M. suffered from
emotional breakdowns and fits of anger, 5) when visitations did not occur, J.H.M. had
periods of calm and could focus better, 6) the Schreibers have lived in their present home
for over ten years and have stable employment and income, 7) they have planned for the
provision of J.H.M. in the future in the form of life insurance and college planning, 8) they
attend counseling along with J.H.M., 9) J.H.M., at the time of trial, had lived with the
Schreibers for approximately six years and 10) they have filed to adopt J.H.M. Again,
viewed in the light most favorable to the best interests of the child finding, the evidence
was sufficiently clear and convincing that a reasonable factfinder could have formed a firm
belief or conviction that Hayes’ termination of her parental rights was in the best interests
of the child. We further conclude that, viewed in light of the entire record, any disputed
evidence could have been reconciled in favor of the best interests finding or was not so
significant that the factfinder could not reasonably have formed a firm belief or conviction
that it was in the best interests of the child that Hayes’ rights be terminated.
 
 
Issue Eight - Exclusion of Hayes’ Video Exhibits
          In her eighth issue, Hayes contends that the trial court erred by prohibiting her from
playing various video tapes taken by her private investigator to the jury. The Scheibers
objected to her playing them because of their cumulative nature. We overrule the issue.
          The record reflects that the jury was shown several video tapes before the
Scheibers lodged their objection. Despite the objection, the trial court nonetheless
admitted all the tapes into evidence. Furthermore, Hayes admitted that the tapes not
shown were of the same nature as those shown. So too was she allowed to continue
showing tapes of instances that were different or unique from the others. Under these
circumstances, we do not find that the trial court’s decision was an abuse of discretion.
Issues Ten and Eleven - Trial Amendment/Failure to Grant a Continuance
          In her tenth and eleventh issues, Hayes contends that the trial court erred by
allowing the Schreibers to amend their petition on the day of trial to include “Short as a
party to conservatorship.” She further complains that the trial court erred by denying her
request for a continuance after it allowed the Schreibers to amend their petition. We
disagree and overrule the issues.
          Hayes attempts to raise issues as to the termination of Short’s rights, but we find
she does not have standing to do so; neither she nor her attorney represented Short. See
In re Z.J., 153 S.W.3d 535, 538 (Tex. App.–Amarillo 2004, no pet.). Because she lacked
standing to complain of the trial amendment, her issue regarding the denial of her motion
for continuance was not an abuse of discretion. Villegas v. Carter, 711 S.W.2d 624, 626
(Tex. 1986) (stating that the granting or denial of a motion for continuance is within the trial
court’s sound discretion). 
Issue Twelve - Improper Disqualification of Jury Veniremen
          According to Hayes, three jurors were improperly excused for economic hardship
and two others were improperly excused for bias or prejudice. This allegedly was error
which resulted in her failing to receive a fair trial. We overrule the issue.
          Hayes contends that juror Ronald Mitchell was struck for cause because he was a
member of the Church of Jesus Christ of Latter Day Saints and he held a fundamental
belief that family is forever. Apparently she sought an advantage from that belief and his
other belief that children were not “property” to be passed back and forth. Nonetheless,
the record also had evidence indicating that Mitchell was also troubled by Hayes’ position.
          Whether a juror is biased or prejudiced is a factual determination to be made by the
court in the event the evidence is conflicting. Hyundai Motor Co. v. Vasquez, 189 S.W.3d
743, 760 n.77 (Tex. 2006) (stating that if prejudice is not established as a matter of law,
the trial court makes a factual determination as to whether the venire member should be
disqualified); see Swap Shop v. Fortune, 365 S.W.2d 151 (Tex. 1963) (because trial judges
are actually present during voir dire, they are "in a better position . . . to evaluate the juror's
sincerity and their capacity for fairness and impartiality"). Therefore, trial courts exercise
discretion in deciding whether to strike venire members for cause when bias or prejudice
is not established as a matter of law, and there is error only if that discretion is abused. 
See Malone v. Foster, 977 S.W.2d 562, 564 (Tex. 1998). Because the record shows that
Mitchell was conflicted in his beliefs as a potential juror on this case, we find that the trial
court did not abuse its discretion in dismissing him for cause.
          Regarding Hayes’ contentions that the other four jurors were improperly dismissed
because the reason given by the court did not fall within the parameters of chapter 62 of
the Texas Government Code, we find the contention inadequately briefed. According to
Hayes, because the trial court erred in improperly dismissing these jurors, she was denied
the “randomness and jury impartiality” guaranteed her. However, Hayes does not explain
the latter contention; therefore, we find it conclusory and waived. Canton-Carter v. Baylor
College of Medicine, 271 S.W.3d 928, 931 (Tex. App.–Houston [14th Dist.] 2008, no pet.);
see City of Hawkins v. E.B. Germany and Sons, 425 S.W.2d 23, 26 (Tex. Civ. App.–Tyler
1968, writ ref’d n.r.e.) (holding that it has been the established rule in this state that even
though the challenge for cause was improperly sustained, no reversible error is presented
unless appellant can show he was denied a trial by a fair and impartial jury). Hayes failed
to carry her burden in showing how she was denied a fair and impartial jury, therefore the
argument is waived.
Short’s Appeal 
Issue Four - Sufficiency of the Evidence 
          We address Short’s fourth issue first. Through it, he contends that the evidence
was insufficient to support termination. We disagree and overrule the issue.
          Again, because the case was submitted in broad form, we need only find the
evidence sufficient to support a single ground and that it was in the best interests of the
child to terminate Short’s parental rights.


 Keeping in mind the standards of review
mentioned above, we address whether Short knowingly engaged in criminal conduct that
resulted in his conviction, imprisonment, and inability to care for the child for not less than
two years from February 17, 2006.Subsection Q permits termination when the clear and convincing evidence shows
that the parent "knowingly engaged in criminal conduct that has resulted in the parent's:
(i) conviction of an offense and (ii) confinement or imprisonment and inability to care for the
child for not less than two years from the date of filing the petition." Tex. Fam. Code Ann.
§161.001(1)(Q) (Vernon 2008); see In re A.V., 113 S.W.3d 355, 360-61 (Tex. 2003). That
is, subsection Q permits termination if the evidence shows that, during the two-year period
following the initiation of the termination proceedings, the parent will be confined or
imprisoned and unable to care for the child. See id. at 360-61.
          It must be remembered that establishing incarceration for the requisite period does
not, by itself, justify termination pursuant to subsection Q. In re B.M.R., 84 S.W.3d 814,
818 (Tex. App.–Houston [1st Dist.] 2002, no pet.); In re Caballero, 53 S.W.3d 391, 395
(Tex. App.–Amarillo 2001, pet. denied). The evidence must also show that the parent was
unable to care for the child for two years from the date of the petition's filing. In re B.M.R.,
84 S.W.3d at 818. Thus, incarceration and an inability to care for the child must each be
established by the evidence to support termination. See In re H.R.M., No. 14-05-00281-CV, 2007 Tex. App. Lexis 1878, 2007 WL 707553, at*1 (Tex. App.–Houston [14th Dist.]
March 8, 2007, no pet.) (mem. op.); see also In re B.M.R., 84 S.W.3d at 818. 
          Turning to the record, we find evidence that the Schreibers filed their petition to
terminate Short’s rights on February 16, 2006. Thus, at the latest, the Schreibers had to
show that Short would remain incarcerated on February 17, 2008. Short contends that the
Schreibers did not do so. Short is mistaken. The Schreibers introduced evidence
establishing that Short was convicted of the felony offense of burglary and was sentenced
to six years imprisonment. The judgment of conviction indicates that Short began serving
the six-year sentence in February of 2004, and, if served in full, the sentence precludes
him from being free until February of 2010. Yet, Short believed that he was subject to
parole and could have been released before February of 2008. 
          The Texas Supreme Court discussed the effect of evidence showing that an
incarcerated parent would be considered for parole in In re H.R.M., 209 S.W.3d 105 (Tex.
2006). There it said that the “[m]ere introduction of parole-related evidence . . . does not
prevent a factfinder from forming a firm conviction or belief that the parent will remain
incarcerated for at least two years." Id. at 109. It also stated that "[p]arole decisions are
inherently speculative, and while all inmates doubtless hope for early release and can take
positive steps to improve their odds, the decision rests entirely within the parole board's
discretion." Id. The H.R.M. court also observed that the jury was free to disregard the
father's testimony regarding parole. Id. So, the jury at bar was entitled to disregard Short's
testimony regarding parole. See id. This seems especially so since he had been
considered and denied parole in the past due to his misconduct.
          Short next contends that the Schreibers failed to offer sufficient evidence to show
he was unable to care for J.H.M. This was so because he believed that “his mother would
be ready, willing, and able to care for the child” especially since she is already taking care
of another child of his through another relationship. Yet, the financial, physical, and
emotional means available to his mother went undeveloped. Simply because she is caring
for one of his children while he serves his prison sentence does not ipso facto mean that
she can care for all of them. That his mother did not proffer testimony supporting his belief
is also of import for we cannot merely assume that he speaks for her. In fact, the record
reflected that his relationship with his mother was estranged and that he had very little, if
any, contact with her. See In re Caballero, 53 S.W.3d at 396 (refusing to place burden on
TDPRS to disprove existence of anyone with whom parent’s child could be placed during
his incarceration because adopting such rule would place an unreasonable burden on
agency and judicial resources). 
          Additionally, since learning that he was J.H.M.’s biological father, Short has made
no attempt to assist the child financially or to contact her either directly or through a family
member. Nor does any evidence show that he arranged for someone to care for the child
while he has been incarcerated. See In re H.R.M., 209 S.W.3d 105 (noting significance
of father’s inability to testify that he had arranged for someone to care for the child during
his incarceration in conducting a factual sufficiency analysis in a subsection Q case). 
          Given the record, we conclude that the evidence, viewed in the light most favorable
to the section 161.001(1)(Q) finding, was sufficiently clear and convincing to enable a
reasonable factfinder to form a firm belief or conviction that Short knowingly engaged in
criminal conduct that has resulted in his (i) conviction of an offense and (ii) confinement or
imprisonment and an inability to care for the child for not less than two years from the date
of the filing of the petition. We further conclude that, viewed in light of the entire record,
any disputed evidence could have been reconciled in favor of the §161.001(1)(Q) finding
or was not so significant that the factfinder could not reasonably have formed a firm belief
or conviction that the elements of subsection Q were shown. Accordingly, we hold that the
evidence was legally and factually sufficient to support the section 161.001(1)(Q) finding. 
We overrule Short’s fourth issue.
Issue One - Trial Amendment
          We next address the allegation that the trial court erred in allowing the Schreibers
to add a new ground for termination after trial had started. However, having found the
evidence sufficient to support termination on a different ground than that alleged in the trial
amendment, we find that error, if any, was harmless and we overrule the issue. In re
A.R.R., 61 S.W.3d 691, 698 (Tex. App.–Fort Worth 2001, pet. denied) (holding that as long
as the court finds that at least one of the multiple grounds for termination was supported
by the evidence and that termination was in the best interest of the child, the court may
uphold the trial court's judgment even if there was not sufficient evidence to support
termination on the other alleged grounds). 
Issue Two - Guardian Ad Litem’s Testimony
          Next, we address whether it was error for the trial court to allow the ad litem to testify
about his recommendations when he never interviewed Short. We overrule the issue.
          Section 107.002 of the Texas Family Code specifies that the powers and duties of
a guardian ad litem for a child include, within a reasonable time after the appointment the
obligation to “interview . . . the parties to the suit.” Tex. Fam. Code Ann. §107.002(b)(1)
(Vernon 2008). In the case before us, the ad litem testified that she had spoken to Hayes
and her husband, John, to J.H.M., and to the Schreibers; however, she did not interview
Short. This was so, according to the ad litem, because he was in prison and was not
known of until late in the suit. Furthermore, he had not been involved in any aspect of
J.H.M.’s life. 
          In our reading of the statute, we do not find that the guardian ad litem will not be
allowed to testify if they do not follow all of the requirements as set out in the statute. 
Furthermore, we find that this would go more to the weight of the evidence and not its
admissibility. Therefore, we do not find that the trial court abused its discretion in allowing
the ad litem to give her opinion regarding the best interests of J.H.M.
Issue Three - Broad Form Submission
          In his third issue, Short complains about the use of the broad form submission in
this case. We overrule it for the same reasons underlying our decision to overrule the
identical contention asserted by Hayes.
          Having overruled all of the issues, we affirm the judgment of the trial court.
 
                                                                           Brian Quinn
                                                                          Chief Justice